**PUBLISH**

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 95-4427

_____

D. C. Docket No. 93-352-CR-SM

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
09/04/98
THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

NATHANIEL VEAL, JR., ANDY WATSON,
PABLO CAMACHO, CHARLIE HAYNES, JR.,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

**(September 4, 1998)**

Before ANDERSON and BIRCH, Circuit Judges, and WOODS*, Senior
District Judge.

_____
*Honorable Henry Woods, Senior U.S. District Judge for the
Eastern District of Arkansas, sitting by designation.

BIRCH, Circuit Judge:

These consolidated appeals from convictions of police officers

under 18 U.S.C. § 1512(b)(3) for providing false and misleading

information concerning the death of a drug dealer to state investigators present the issue of whether statements suppressed in a prior civil rights trial pursuant to <u>Garrity v. New Jersey</u>, 385 U.S. 493, 87 S.Ct. 616 (1967),[1] can be admitted in a subsequent obstruction of justice trial. The police officers also challenge the district judge's denial of their motions to dismiss, statutory interpretation, and jury instructions as well as the sufficiency of the evidence supporting their convictions. We affirm.

---

[1] Under <u>Garrity</u>, a public employee is protected so that he does not forfeit his Fifth Amendment right to silence or lose his public employment when requested to give a statement in the course of an internal investigation; such statements may not be used against the employee in a criminal prosecution concerning the matter under investigation. <u>See</u> <u>Lefkowitz v. Turley</u>, 414 U.S. 70, 79-80, 94 S.Ct. 316, 323 (1973); <u>Garrity</u>, 385 U.S. 493, 87 S.Ct. 616 (1967); <u>Harrison v. Wille</u>, 132 F.3d 679, 681 n.2 (11th Cir. 1998) (per curiam).

2

## I. FACTUAL AND PROCEDURAL BACKGROUND

On Friday, December 16, 1988, defendants-appellants Nathaniel Veal, Jr., Andy Watson, Pablo Camacho, and Charlie Haynes, Jr. as well as Ronald Sinclair and Thomas Trujillo were members of the Street Narcotics Unit ("SNU") of the Miami Police Department. According to trial testimony, before the 4:00 P.M. roll call on that day, the Chief of Police received a letter in which an anonymous informant reported that unidentified drug dealers had met at 7th Avenue and 32nd Street, NW, in Miami and had contracted to kill Camacho. The SNU members were aware that this address was the residence of Leonardo Mercado, a drug dealer. Camacho, Veal, Watson, and Haynes were told of the death threat.

En route to a sting operation at the proximate location of 7th Avenue and 57th Street, NW, Camacho and Watson, Veal and Haynes, and Sinclair and Trujillo, proceeding in three undercover vehicles, stopped at Mercado's house and exited their vehicles. Camacho approached Mercado, who was outside, put his hand on Mercado's shoulder, and escorted him into his house. In the next few

minutes, the other officers entered the house, closed the door, and lowered the curtains.  Shortly thereafter, police cars and a fire/rescue unit with emergency medical treatment arrived in response to calls for assistance from Sinclair and Camacho.

When Officer Mary Reed of the Miami Police Department arrived and entered the house, she saw Camacho, Veal, Haynes, and Sinclair and a bloody Mercado lying on the floor moaning.  Haynes pointed to Mercado and  informed Reed that he was "the mother fucker that put a contract out on Camacho."  Supp.R8-22.  The officers urged Reed to "get [her] kick in," id. at 23,  but she declined because "[h]e was in bad shape," id. at 24.  Despite emergency medical efforts, Mercado, who had suffered extensive head trauma and a severely bruised chest, died at the scene.  A subsequent autopsy revealed multiple bruises and bloody wounds to his head, scalp, neck and face as well as fractured ribs.

Knowing that Mercado was dead, Camacho, Veal, Watson, Haynes, and other SNU officers left the scene and returned to the police department.  Various eyewitnesses testified that they saw

4

Camacho, Veal, Watson, Haynes, Sinclair, and Trujillo when they returned to the police station, entered the lieutenant's office, and closed the door. Although none of these individuals had noticed anything unusual about Camacho's appearance when he entered the lieutenant's office, the witnesses saw a rip in the front, chest area of his shirt and on the sleeve when he left that office. While inside the SNU lieutenant's office, one of the officers took pictures of Camacho that purportedly reflected his condition after the altercation with Mercado. These photographs, showing a long rip in the front of Camacho's shirt, which also was missing a pocket, were placed in the lieutenant's cabinet together with a butcher knife, supposedly retrieved from the altercation scene, and a bag of crack cocaine allegedly seized from Mercado.

At 7:55 P.M. that evening, Camacho went to the office of crime-scene technician Sylvia Romans, who photographed arrestees and/or officers involved in "control" situations, when an officer used more than normal force in making an arrest. Camacho asked Romans to photograph him to show his clothing and injuries. Romans complied

5

and her photographs reveal a large tear in the front of Camacho's shirt, the pocket missing, and a long rip in the back of his right shirt sleeve. Romans noticed that Camacho had no cuts and was not bleeding anywhere but that his right eye was bruised.

A freelance photographer took random photographs at the Mercado residence after the altercation. One photograph showed Camacho at the doorway of Mercado's residence; his shirt was undamaged with no tear in the front and the pocket was intact. The same freelance photographer came to the SNU office and took additional photographs of Camacho that showed a large rip in the front of his shirt that had been taped together and the pocket was missing. When Camacho went to Romans's office a short time later to have her photograph him, the tape had been removed, the rips to his shirt were exposed, and there was no pocket on his shirt. Two visiting Detroit police officers accompanied the SNU lieutenant to Mercado's house. One testified that she saw an officer leaving the house with a rusty butcher knife. She saw a similar knife on the table in the lieutenant's office when the officers left that office.

6

At trial, an expert in fiber analysis was asked whether the tears to Camacho's shirt resulted from knife cuts or a tear. The expert testified that a mechanical object had been used to make a half-inch cut to the front of the shirt and that the shirt then had been ripped with a fifteen-inch tear. The damage to the right sleeve also was consistent with the shirt having been cut with a mechanical object and then torn. Similarly, the damage to the pocket area was consistent with the pocket having been cut and then torn from the shirt.

Camacho later was treated at a hospital for elevated blood pressure and swelling; none of the other officers had any injuries. In the hours following Mercado's death, Miami homicide investigators were advised that Camacho had been involved in the altercation with Mercado but that Veal, Watson, Haynes, and Sinclair had not. In the early morning hours of December 17, 1988, Veal, Watson, Haynes, and Sinclair gave statements to state homicide investigators regarding their knowledge of the circumstances surrounding Mercado's death. Each asserted that the officers had stopped at Mercado's house because Camacho had seen some drug activity there that justified

7

investigation and not because of the death threat to Camacho. Each denied having physical contact with Mercado or having heard or seen anything that would explain or assist the investigators in determining how Mercado's injuries had occurred. They stated that, by the time that they were inside the house, the altercation was over and Mercado was on the floor. Veal, Watson and Haynes also denied meeting with Camacho at the SNU office.

At trial, an expert in forensic serology and blood-stain-pattern interpretation compared the blood stains on Mercado to the blood stains on the clothing and shoes worn by Camacho, Veal, Watson, and Haynes on December 16, 1988. Thus, he reconstructed who had come into contact with Mercado and the amount of force used during this contact. The expert found that Veal's pants and shoes were covered with blood stains of Mercado's type. The blood spatter on Veal's pants and shoes was consistent with Veal's having struck Mercado multiple times using medium to medium-high force. The back of Veal's right shoe had a pattern consistent with having been stamped

8

into Mercado's head multiple times.  Additionally, shoe patterns on the seat and ankle areas of Mercado's pants matched Veal's right shoe.

Similarly, Watson's pants were blood-stained inside the cuffs and all the way up to the lap and pocket areas.  The blood spatter on Watson's pants and sneakers was consistent with his having been within two to three feet of a direct impact to Mercado of medium to medium-high force.  The location of the blood on Watson's pants and the spatter of Mercado's blood on two walls in the corner of the room above the bed was consistent with Watson's having been in the immediate vicinity of a direct impact to Mercado's head while Mercado was in an upright position in the corner of the room near the bed and not after Mercado was on the floor.  A criminology expert in latent prints also testified that Watson's right shoe was consistent with several of Mercado's wounds and that his shoes were consistent with injuries in two different areas of one wound, which showed two points of contact.  Another smaller wound matched the forward part of Watson's right shoe, and a third wound also matched  Watson's shoe.

Haynes's left shoe had blood on it and his shirt had one blood spot. His pants, however, had no blood stains because he had laundered his pants and shoe laces before being asked to surrender them. A criminology expert testified that the wounds on Mercado's forehead and left cheek near his eye matched Haynes's left shoe and were consistent with a single contact.

On Monday, December 19, 1988, Federal Bureau of Investigation ("FBI") Agent David Hedgecock, assigned to the civil rights unit in Miami, learned of the incident resulting in Mercado's death and opened an investigation in conjunction with Miami Police Department homicide detectives. This investigation led to federal, civil rights charges against Camacho, Veal, Watson, Haynes, Sinclair, and Trujillo. In conducting the FBI investigation, Hedgecock received, reviewed, and used all of the evidence collected by the state, including the officers' statements, Romans's photographs of Camacho, and all other physical evidence. The officers were charged with infringing Mercado's civil rights in violation of 18 U.S.C. §§ 241 and 242.

In the federal civil rights case that was tried in 1990, the officers moved pursuant to Garrity to suppress their statements concerning the circumstances of Mercado's death. The district judge granted the officers' suppression motions because he determined that the statements made by Veal, Watson and Haynes resulting from questioning at the police station and with the advice of counsel were within the scope of Garrity.[2] See United States v. Camacho, 739 F. Supp. 1504 (S.D. Fla. 1990). The civil rights trial resulted in acquittals on the conspiracy count, and the jury was unable to reach a verdict on the substantive counts. Sinclair died after the civil rights trial.

In July, 1993, a federal grand jury in the Southern District of Florida indicted Camacho, Veal, Watson, and Haynes.[3] They were charged in Count I with conspiring under 18 U.S.C. § 371 to obstruct the due administration of justice in violation of 18 U.S.C. § 1503 and engaging in misleading conduct designed to hinder, delay, and prevent

---

[2] Camacho and Trujillo were not interviewed and gave no formal statements because they were identified as having been directly involved in Mercado's death.

[3] Jesus Aguer and Armando Aguilar, codefendants in the civil rights trial, were acquitted of all charges. Trujillo was not indicted in the obstruction of justice case.

11

the communication of information relating to the possible commission

of a federal offense to a federal law enforcement officer or judge in

violation of 18 U.S.C. § 1512 and, in Count II, with knowingly

misleading state investigators regarding the true circumstances of the

death of Mercado with the intent to prevent the communication of

information relating to the possible commission of a federal offense in

violation of 18 U.S.C. §§ 1512(b)(3) and 2.   The remaining counts

charged them with perjury in violation of 18 U.S.C. § 1623 and false

statements in violation of 18 U.S.C. § 1001.

All of the officers moved to dismiss Count II because it failed to

allege facts sufficient to constitute a violation of 18 U.S.C. § 1512(b)(3).

The district judge denied those motions.  Veal, Watson and Haynes

moved to suppress their statements that had been suppressed under

Garrity in the civil rights trial.  The district judge also denied those

motions.

Following a ten-week trial, Camacho, Veal, Watson, and  Haynes

were convicted on Count II and acquitted on all other counts.  The

district judge denied their motions for judgments notwithstanding the

verdict and/or for a new trial.  Camacho was sentenced to thirty months of imprisonment and two years of supervised release.  Veal, Watson and Haynes each were sentenced to twenty-one months of imprisonment and two years of supervised release.  All remain on bond pending appeal.

## II. ANALYSIS

On appeal, Veal, Watson and Haynes challenge the district judge's denial of their motions to suppress their statements after Mercado's death because the same judge had suppressed those statements under Garrity in the civil rights trial.  Camacho, Veal, Watson and Haynes argue that the district judge improperly denied their motions to dismiss based on 18 U.S.C. § 1512(b)(3) and incorrectly instructed the jury on this statute.  All contend that the evidence was insufficient to support the verdicts against them.  Veal argues that the district judge improperly instructed the jury on materiality.  We will address each of these arguments.

### A. Admission of Statements Previously Suppressed Under Garrity

13

Veal, Watson and Haynes argue that the district judge erred by permitting the government to use their statements concerning Mercado's death in the obstruction of justice trial when that judge had suppressed those statements under Garrity in the civil rights trial. In Garrity, the Supreme Court held that Fifth Amendment protections apply to police officers subjected to interrogation by other law enforcement officers and that incriminating statements made under threat of termination for remaining silent are inadmissible in a subsequent criminal prosecution concerning the matter of inquiry absent a knowing and voluntary waiver.[4] Garrity, 385 U.S. at 500, 87 S.Ct. at 620. Following an evidentiary hearing, the district judge suppressed the officers' statements under Garrity in the civil rights trial because he concluded

> that the Defendants Haynes, Sinclair, Veal and Watson
> subjectively believed that failure to answer would result in
> termination, that they believed they could not invoke the

---

[4] The Fifth Amendment protection afforded by Garrity to an accused who reasonably believes that he may lose his job if he does not answer investigation questions is self-executing; that is, it arises by operation of law; no authority or statute needs to grant it. See Wiley v. Mayor & City Council of Baltimore, 48 F.3d 773, 777 n.7 (4th Cir. 1995); Benjamin v. City of Montgomery, 785 F.2d 959, 961 (11th Cir. 1986); Erwin v. Price, 778 F.2d 668, 670 (11th Cir. 1985).

Fifth Amendment without being fired, that these beliefs under the facts of this case were objectively reasonable, and that the actions of the State were directly implicated in creating this belief.

Camacho, 739 F. Supp. at 1520. The district judge reasoned that, because counsel had informed the officers "that they must give statements and answer every question put by the investigators, that they could not invoke the Fifth Amendment, and that they had Garrity immunity," id. at 1517-18, the officers "reasonably believed that they were compelled to waive their Fifth Amendment rights during their interviews with the investigating officers," id. at 1518.

In the obstruction case, the government alleged that the officers acted individually and collectively to impede the official investigation into the death of Mercado. Veal, Watson and Haynes sought suppression of their statements made to state investigating officials at police headquarters on December 17, 1988.[5] They argue that these statements, suppressed under Garrity in the civil rights trial, should not

_____

[5] The indictment alleges as overt acts that Veal, Watson and Haynes "[o]n December 16, 1988 and December 17, 1988, in Miami, Florida, [each] . . . falsely told State of Florida law enforcement investigators that he did not touch Leonardo Mercado, observe any contact with Leonardo Mercado, or have any knowledge of what caused the injuries that resulted in the death of Leonardo Mercado." R1-1-6-7, ¶¶ I-K.

15

have been admitted into evidence in the obstruction case to establish

charges of conspiracy to obstruct justice, conspiracy to tamper with a

witness, tampering with a witness, and perjury. Concluding that Garrity

and the Fifth Amendment do not protect false statements from

subsequent prosecutions for such crimes as perjury and obstruction of

justice, the district judge admitted the officers' statements.

Veal, Watson and Haynes contend that their statements

suppressed in the civil rights trial were per se inadmissible in the

obstruction of justice trial. They argue that statements declared to be

protected by Garrity are forever barred from use in any prosecution,

including one for perjury, false statements, or obstruction of justice.[6]

Their argument is premised on the notion that their statements were

---

[6] In an appeal to this court by defense attorneys who were subpoenaed to testify before the grand jury following the civil rights trial, we stated: "Immunity under Garrity prevents any statements made in the course of the internal investigation from being used against the officers in subsequent criminal proceedings." In re Federal Grand Jury Proceedings, 975 F.2d 1488, 1490 (11th Cir. 1992) (per curiam). We note that the law-of-the-case doctrine does not apply in this case because the issue in that appeal, denial by the district judge of the attorneys' and intervenors Veal, Watson and Haynes's motions to quash the attorneys' subpoenas based on the attorney-client privilege, is different from the issue in this obstruction case of their giving false statements. See Jackson v. Motel 6 Multipurpose, Inc., 130 F.3d 999, 1003 n.7 (11th Cir. 1997).

16

coerced because they would have been fired from the police department if they had not provided  statements.

In determining whether the government may use Garrity statements in a subsequent federal, criminal prosecution, we note that the Supreme Court has been resolute in holding that the Fifth Amendment does not shield perjured or false statements.  Concerning false testimony before a grand jury, the Court spoke clearly and strongly:

> In this constitutional process of securing a witness' testimony, perjury simply has no place whatsoever. Perjured testimony is an obvious and flagrant affront to the basic concepts of judicial proceedings. . . . Hence, Congress has made the giving of false answers a criminal act punishable by severe penalties . . . .
> 	. . . .
> [A] witness sworn to tell the truth before a duly constituted grand jury will not be heard to call for suppression of false statements made to that jury, any more than would be the case with false testimony before a petit jury or other duly constituted tribunal.

United States v. Mandujano, 425 U.S. 564, 576, 582, 96 S.Ct. 1768, 1776, 1779 (1976) (emphasis added); see United States v. Wong, 431 U.S. 174, 178, 97 S.Ct. 1823, 1825 (1977) (regarding false, grand jury testimony about bribing undercover police officers, the Court

17

emphasized that "the Fifth Amendment privilege does not condone perjury. It grants a privilege to remain silent without risking contempt, but it 'does not endow the person who testifies with a license to commit perjury.'" (quoting Glickstein v. United States, 222 U.S. 139, 142, 32 S.Ct. 71, 73 (1911)); see also United States v. Knox, 396 U.S. 77, 82, 90 S.Ct. 363, 366 (1969) (explaining that the predicament of having to choose between incriminatory truth and falsehood, as opposed to refusing to answer, does not justify perjury or answering falsely in a case involving filing a false tax return, the Court concluded that the defendant took "a course that the Fifth Amendment gave him no privilege to take."). Using this authority, our court declined to suppress false grand jury testimony and upheld a conviction under 18 U.S.C. § 1623 for perjury. See United States v. Olmeda, 839 F.2d 1433 (11th Cir. 1988); see also LaChance v. Erickson, ___ U.S. ___, ___, 118 S.Ct. 753, 756 (1998) ("It is well established that a criminal defendant's right to testify does not include the right to commit perjury.").

Even in the case of statutorily immunized testimony, the "Court has  never held . . . that the Fifth Amendment requires immunity

18

statutes to preclude all uses of immunized testimony. . . . [N]either the immunity statute nor the Fifth Amendment precludes the use of respondent's immunized testimony at a subsequent prosecution for making false statements." United States v. Apfelbaum, 445 U.S. 115, 125, 131, 100 S.Ct. 948, 954, 957 (1980).[7]  Thus, an immunized accused who testifies falsely may not use the self-incrimination clause as a shield against a subsequent prosecution for perjury, false statements, or obstruction of justice.  Otherwise, an option would be created that would make a mockery of conferring immunity on an accused because the purpose of granting immunity would be

---

[7] In Apfelbaum, the Supreme Court held that neither the federal use immunity statute nor the Fifth Amendment precluded the use of a defendant's false statements in a subsequent criminal prosecution. See 18 U.S.C. § 6002 (providing that no testimony or other information compelled under an immunity order may be used against the witness in any criminal trial "except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order" (emphasis added)). The Apfelbaum defendant invoked his Fifth Amendment privilege during grand jury testimony.  After receiving use immunity under § 6002, he testified falsely.  In upholding his  subsequent prosecution under the federal perjury statute, 18 U.S.C. § 1623, for making false statements during testimony, the Court determined that neither the federal use immunity statute nor the Fifth Amendment precluded the use of the defendant's false statements in a subsequent criminal prosecution.  See Apfelbaum, 445 U.S. at 122-23, 126-27, 100 S.Ct. at 952, 955.  We can analogize between the scope of the federal use immunity statute, addressed in Apfelbaum, and Garrity analysis under the Fifth Amendment because our court has held that a Garrity-protected statement is tantamount to use immunity.  See Benjamin, 785 F.2d  at 961; Erwin, 778 F.2d at 670; Hester v. City of Milledgeville, 777 F.2d 1492, 1496 (11th Cir. 1985).

defeated.[8]  The Court noted that "[t]he legislative history of [18 U.S.C.]

§ 6002 shows that Congress intended the perjury and false-

declarations exception to be interpreted as broadly as constitutionally

permissible."  Id. at 122, 100 S.Ct. at 952.  When an accused has been

accorded immunity to preserve his right against self-incrimination, he

must choose either to relinquish his Fifth Amendment right and testify

truthfully, knowing that his statements cannot be used against him in a

subsequent criminal prosecution regarding the matter being

investigated, or continue to assert the privilege and suffer the

consequences.[9]  There is no third option for testifying falsely without

incurring potential prosecution for perjury or false statements.  See

Knox, 396 U.S. at 82, 90 S.Ct. at 366 (determining that the pressures

---

[8] Although a "'narrow exception,'" the Apfelbaum Court noted  that perjury prosecutions resulting from immunized testimony are permitted: "If the rule is that a witness who is granted immunity may be placed in no worse a position than if he had been permitted to remain silent, the principle that the Fifth Amendment does not protect false statements serves merely as a piece of a legal mosaic justified solely by stare decisis, rather than as part of a doctrinally consistent view of that Amendment."  445 U.S. at 128 & n.11, 100 S.Ct. at 955-56 & n.11.

[9] These consequences include a contempt order in the case of  18 U.S.C. § 6001 immunity or forfeiture of any benefits under a plea/cooperation agreement in the case of "pocket" immunity.  Grants of informal or "pocket" immunity are evaluated under the same rules as grants of formal or § 6001 immunity.  See United States v. Harvey, 869 F.2d 1439, 1444 (11th Cir. 1989) (en banc).  Immunity under § 6002 provides use and derivative-use immunity, which generally prevents the government from using the contents of the testimony in a criminal prosecution of the individual.  See Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653 (1972).

that accompany the obligation to tell the truth, such as in an investigation, do not justify "communicating false information[, which is] simply not testimonial compulsion").

Like false testimony before a grand jury, the Court has not excluded from criminal liability false statements made to governmental agents or agencies, whether or not those statements were made under oath. In upholding a conviction for falsely denying Communist affiliation in an affidavit filed with a governmental agency, the Court stated: "Our legal system provides methods for challenging the Government's right to ask questions–lying is not one of them. A citizen may decline to answer the question, or answer it honestly, but he cannot with impunity knowingly and willfully answer with a falsehood." Bryson v. United States, 396 U.S. 64, 72, 90 S.Ct. 355, 360 (1969) (footnote omitted). In determining that the false "exculpatory no" answer in response to governmental agents conducting an investigation is not excluded from prosecution for false statements, the Court explained: "Certainly the investigation of wrongdoing is a proper governmental function; and since it is the very purpose of an

21

investigation to uncover the truth, any falsehood relating to the subject of the investigation perverts that function." Brogan v. United States, ___ U.S. ___, ___, 118 S.Ct. 805, 809 (1998). The Court concluded that "neither the text nor the spirit of the Fifth Amendment confers a privilege to lie." Id. at ___, 118 S.Ct. at 810. Holding that a government agency may take adverse action against employees who make false statements to agency investigators concerning alleged misconduct, the Court determined that it was irrelevant that the statements were not made under oath for the purpose of criminal culpability. See LaChance, ___ U.S. at ___, 118 S.Ct. at 756. Thus, the Court has determined that the Fifth Amendment does not protect false statements from a later prosecution for perjury or false statements whether they occur under oath, with immunity, or during a governmental investigation.

Although the Supreme Court has not addressed the specific issue before us where the false statements previously were suppressed in the Garrity context, other circuits have held that the Fifth Amendment and Garrity provide no insulation against a subsequent perjury or

obstruction of justice charge if a witness makes false statements. In

United States ex rel. Annunziato v. Deegan, 440 F.2d 304 (2d Cir.

1971), the defendant was convicted in state court for committing

perjury before a grand jury. He subsequently filed a habeas corpus

petition in which he asked the federal courts to reverse his conviction,

partly because he contended that his false statements had been

compelled in violation of Garrity. The Second Circuit analyzed this

argument as follows:

> [A]ppellant claims that his testimony under compulsion
> before the grand jury, because his failure to waive immunity
> would have resulted in dismissal from public employment,
> violated his privilege against self-incrimination under the
> Fifth and Fourteenth Amendments. . . . [A]ppellant was not
> prosecuted for past criminal activity based on what he was
> forced to reveal about himself; he was prosecuted for the
> commission of a crime while testifying, i.e. perjury. In short,
> where a public employee may not be put to the Hobson's
> Choice of self-incrimination or unemployment, he is not
> privileged to resort to the third alternative, i.e., lying. The
> Supreme Court has squarely so held.

Id. at 306 (emphasis added).

In several cases, the Seventh Circuit followed the reasoning of

Annunziato and affirmed the convictions of Chicago police officers for

making false statements before a grand jury in violation of 18 U.S.C. §

23

1623, although the officers received Garrity protection for their testimonies. In United States v. Devitt, 499 F.2d 135 (7th Cir. 1974), that court determined that

> Garrity and its progeny do not proscribe the use, in a criminal prosecution under 18 U.S.C. § 1621 or § 1623, of a defendant's allegedly perjurious statements . . . . Garrity provides the witness with adequate protection against the government's use, in subsequent criminal proceedings, of information obtained as a result of his testimony, where his refusal to testify would form the basis for disciplinary action against him. Gardner [v. Broderick, 392 U.S. 273, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968),] and [Uniformed] Sanitation Men [Ass'n v. Commissioner of Sanitation, 392 U.S. 280, 88 S.Ct. 1917, 20 L.Ed.2d1089 (1968),] provide the witness with a shield against such disciplinary action based upon his refusal to testify, in cases in which he refuses to do so, believing that his testimony or the fruits thereof can be used against him in subsequent criminal proceedings.
> Together, these decisions provide adequate protection of the witness's Fifth Amendment rights. We find no reason or justification for extending this umbrella of protection to shield a witness against prosecution for knowingly giving false testimony.

Id. at 142 (emphasis added); see also United States v. Pacente, 503 F.2d 543 (7th Cir. 1974) (en banc); United States v. Nickels, 502 F.2d 1173 (7th Cir. 1974).

The Third Circuit also addressed similar facts in Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia, 859 F.2d 276, 281 (3d

24

Cir. 1988), where a police officer union brought suit against the city and argued that a questionnaire plus a polygraph examination that had to be completed prior to an officer's admission into a special unit of the police department violated the officer's Fifth Amendment rights. The court explained:

> [T]his argument [police union's argument that threat of demotion or failure to obtain promotion absent completion of application violates Fifth Amendment] presents us with a mixture of plainly erroneous and potentially meritorious but more difficult issues. There can be no question, for instance, that the police department may prosecute officers for lying on the questionnaire under Pennsylvania law. <u>The fifth amendment does not protect a citizen against the consequences of committing perjury.</u> See <u>U.S. ex rel. Annunziato v. Deegan</u>, 440 F.2d 304 (2d Cir. 1971) (upholding public employee's conviction for perjury based upon testimony obtained under threat of discharge).

<u>Lodge No. 5</u>, 859 F.2d at 281 (emphasis added). Thus, the <u>Annunziato</u> reasoning has influenced other circuits in addressing this issue with the conclusion that the Fifth Amendment does not protect false statements given during testimony that otherwise would be protected by <u>Garrity</u> from future prosecutions concerning those false statements.

25

We also adopt this rationale in our circuit.  Under <u>Garrity</u>, an accused in an internal investigation may be confronted with the grim reality that he can either refuse to give any information and lose his job <u>or</u> provide an incriminating statement about the matter under investigation and not be prosecuted concerning that matter.[10]  An accused may not abuse <u>Garrity</u> by committing a crime involving false statements and thereafter rely on <u>Garrity</u> to provide a safe haven by foreclosing any subsequent use of such statements in a prosecution for perjury, false statements, or obstruction of justice.  Significantly, counsel advised Veal, Watson and Haynes to be truthful in giving their statements to investigating authorities.[11]

---

[10] <u>Compare</u> <u>Erwin</u>, 778 F.2d 668 (affirming dismissal of police officer who refused to answer specific questions about an alleged gun-pointing incident, although departmental regulations stated that his answers could not be used in a subsequent criminal investigation) <u>and</u> <u>Hoover v. Knight</u>, 678 F.2d 578 (5th Cir. Unit B 1982) (upholding dismissal of a police officer pursuant to a  county administrative hearing, wherein the officer asserted her Fifth Amendment right not to testify regarding various charges against her, although a subsequent criminal trial resulted in her acquittal) <u>with</u> <u>Womer v. Hampton</u>, 496 F.2d 99 (5th Cir. 1974) (recognizing that, because governmental employee was informed at an administrative inquiry that he was being questioned regarding improprieties and irregularities that might warrant his dismissal, <u>Garrity</u> precluded his statements from being used in a criminal proceeding regarding that matter).

[11] In the civil trial, the district judge observed:

Robert Klausner [attorney for the Fraternal Order of Police] testified unequivocally — and we credit his testimony – that on the night of the incident he advised Defendants Haynes, Sinclair, Veal and Watson that the applicable rules and regulations prohibited witness officers from invoking their privilege against

26

Although an accused may not be forced to choose between incriminating himself and losing his job under <u>Garrity</u>, neither <u>Garrity</u> nor the Fifth Amendment prohibits prosecution and punishment for false statements or other crimes committed during the <u>making</u> of <u>Garrity</u>-protected statements. Giving a false statement is an <u>independent</u> criminal act that occurs <u>when</u> the individual makes the false statement; it is <u>separate</u> from the events to which the statement relates, the matter being investigated. <u>See</u> <u>Lodge No. 5</u>, 859 F.2d at 281 n.7 (contrasting past criminal activity under investigation with committing a crime while testifying); <u>see also</u> <u>Olmeda</u>, 839 F.2d at 1436-37 nn. 5 & 7 (observing that a defendant may not use the Fifth Amendment self-incrimination privilege to suppress false grand jury testimony that results in a perjury prosecution). We agree with the circuits that have addressed this issue before us and have determined

---

self-incrimination, that they would have <u>to answer all questions truthfully</u> and finally that if they refused to answer they would be fired.

  . . . .

Defendants Haynes, Sinclair, Veal and Watson also persuasively argue that they felt they were required to give a statement based upon the advice of counsel. Attorney Klausner testified that his advice to the officers was <u>to answer truthfully every question put by the investigating officers</u>, under penalty of job loss.

<u>Camacho</u>, 739 F. Supp. at 1516, 1517 (emphasis added).

27

that Garrity-insulated statements regarding past events under investigation must be truthful to avoid future prosecution for such crimes as perjury and obstruction of justice. Garrity protection is not a license to lie or to commit perjury.

Watson and Haynes also argue that their statements were coerced in violation of their Fifth Amendment rights under Mincey v. Arizona, 437 U.S. 385, 98 S.Ct. 2408 (1978).[12] The officers apparently contend that the compulsion under which they gave their statements caused the district judge to suppress their statements under Garrity in the civil rights trial; therefore, those statements should not have been used in the obstruction trial.[13] This argument is unavailing. As we

---

[12] Mincey, grounded in the Due Process Clause, requires the suppression of any confession or statement obtained through official coercion that so completely overbore the will of the accused that he effectively had no choice but to provide the statement. See Mincey, 437 U.S. at 398, 98 S.Ct. at 2416. An involuntary statement cannot be used by the prosecution for any purpose at trial. See United States v. De Parias, 805 F.2d 1447, 1456 (11th Cir. 1986).

[13] We have addressed the compulsion associated with Garrity, the implied threat of dismissal or discipline unless satisfactory responses concerning the matter under investigation are forthcoming. See Harrison, 132 F.3d at 682; Womer, 496 F.2d at 107; see also Devitt, 499 F.2d at 141-42 (describing the coercion involved with Garrity-protected statements as being the threat of discharge, suspension, or disciplinary action upon refusal to testify). Additionally, our court has distinguished between voluntariness in a Garrity situation and other circumstances where Fifth Amendment voluntariness is implicated. See Pervis v. State Farm Fire & Cas. Co., 901 F.2d 944, 947 (11th Cir. 1990); United States v. White, 589 F.2d 1283, 1286-87 (5th Cir. 1979).

have explained, Garrity precludes the use of protected statements in a criminal prosecution regarding the investigated matter to which the statements relate. Garrity does not prevent the admission of false statements in a trial for perjury or obstruction of justice, crimes that occurred at the time that the false statements were given. Logically, the statements would have to be admitted in a perjury or obstruction of justice trial for the jury to determine the falsity. The record in this case shows that the conditions under which these experienced narcotics police officers gave their false statements did not constitute Mincey coercion, particularly with the presence and advice of counsel.[14] Confronted with a difficult decision to give statements, the officers made an additional decision: they voluntarily and deliberately chose to provide false statements making them amenable to prosecution for the crime of obstruction of justice.[15]

---

[14] Our court has recognized that a statement is not involuntary if, "under the totality of the circumstances," it is the product of "free and rational choice" and not extracted "by any sort of threats of violence, or obtained by any direct or implied promises, or by the exertion of any improper influence." Harris v. Dugger, 874 F.2d 756, 761 (11th Cir. 1989).

[15] In addressing voluntariness under the Fifth Amendment, the Former Fifth Circuit commented:

The fifth amendment preserves the right to choose, and the voluntariness of the

29

The predicament in which Veal, Watson and Haynes found themselves at police headquarters in the early morning hours of December 17, 1988, was of their own making. While they feared the loss of their jobs if they claimed the Fifth Amendment and remained silent, Garrity did not afford them refuge to give false statements to investigators and not be prosecuted for obstruction of justice. Their deliberate, false statements resulted from their independent, voluntary choices and impeded the investigation of Mercado's death. By giving false statements, they obstructed justice relating to the investigation of Mercado's death and provided the avenue for prosecution in this case which would have been unavailable if they had told the truth.

## B. Interpretation and Application of 18 U.S.C. § 1512(b)(3)

Veal, Watson, Haynes, and Camacho argue that Count II, as charged in the indictment and as the jury was instructed on it, fails to state a violation of 18 U.S.C. § 1512(b)(3). They support their

---

choice is always affected in some way by the exigencies of a particular situation. The voluntariness inquiry necessarily incorporates an understanding that defendant cannot be free from conflicting concerns, and in any case, defendant must weigh the relative advantages of silence and explanation.

White, 589 F.2d at 1287 (emphasis added).

30

argument by construing the statutory language and challenging the federal nexus of their acts. We address both of these arguments.

1. <u>Statutory Construction</u>

Count II of the indictment, the only count on which Veal, Watson, Haynes, and Camacho were convicted, states that they

> did knowingly engage in misleading conduct toward another person, to wit: law enforcement investigators of the State of Florida, with the intent to hinder, delay, and prevent the communication to a law enforcement officer and judge of the United States of America of information relating to the possible commission of a federal offense, that is, the defendants did knowingly mislead State of Florida law enforcement investigators, and other persons, in order to prevent them from communicating to agents of the Federal Bureau of Investigation and the United States Department of Justice and judges of the United States of America, information relating to the true circumstances surrounding the death of Leonardo Mercado on December 16, 1988.
> All in violation of Title 18, United States Code, Sections 1512(b)(3) and 2.

R1-1-9-10. The statute at issue, 18 U.S.C. § 1512(b)(3), provides in relevant part:

> **Tampering with a witness, victim, or an informant**
>  . . . .
> (b) Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades <u>another person</u>, or attempts to do so, or engages in misleading conduct toward <u>another person</u>, with intent to–

31

. . . .

> (3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings;
>
> shall be fined under this title or imprisoned not more than ten years, or both.

18 U.S.C. § 1512(b)(3) (emphasis added).

Veal, Watson, Haynes, and Camacho contend that "another person" in § 1512(b)(3) does not refer to state law enforcement agents but to persons who have relevant information regarding the possible commission of a federal crime and, thus, can be hindered, delayed or prevented from communicating this information to federal officers. In short, they argue that the statute protects the potential messenger or victim, who already possesses pertinent knowledge, rather than the recipient or investigator, who acquires information. They fortify their argument with the title of the statute, "Tampering with a witness, victim, or an informant," which they claim plainly evidences that Congress intended the statute to protect only those individuals who have information regarding the commission or possible commission of a

federal crime. 18 U.S.C. § 1512. The district judge rejected this argument in a collective motion to dismiss Count II, and we agree.

Our court reviews a district court's statutory interpretation and application de novo. See United States v. Grigsby, 111 F.3d 806, 816 (11th Cir. 1997). In construing a statute, we first look to the plain language of the statute. See Albernaz v. United States, 450 U.S. 333, 336, 101 S.Ct. 1137, 1141 (1981). Words are interpreted with their ordinary and plain meaning because we assume that Congress uses words in a statute as they are commonly understood; we give each provision full effect. See United States v. McLeod, 53 F.3d 322, 324 (11th Cir. 1995). Review of legislative history is unnecessary "unless a statute is inescapably ambiguous." Solis-Ramirez v. United States Dep't of Justice, 758 F.2d 1426, 1430 (11th Cir. 1985) (per curiam); see United States v. Rush, 874 F.2d 1513, 1514 (11th Cir. 1989) (stating that, where statutory language is clear, we will not create an ambiguity with legislative history). Therefore, we deem the plain language of the statute to be conclusive as clearly expressing legislative intent, unless the resulting application would be "absurd" or

"internal inconsistencies" must be resolved. See United States v.

Turkette, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527 (1981).

The application of these principles exposes the infirmities in the arguments by Veal, Watson, Haynes, and Camacho. To reach an analysis of legislative history, they first must show that "another person" is ambiguous and requires the aid of legislative history for interpretation. As the district court found, there is no ambiguity in "another person," which is easily and commonly understood to mean any person, regardless of whether he possessed knowledge of the commission or possible commission of a federal crime from being an eyewitness or investigating official. The statute broadly forbids one to "engage[] in misleading conduct toward another person, with the intent to . . . hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense." 18 U.S.C. § 1512(b)(3). The government alleged that Veal, Watson, Haynes, and Camacho misled state investigators by not telling them the true circumstances surrounding Mercado's death to prevent the

34

investigators from learning the actual facts of his death and, thereby, precluding their communicating those facts to the Federal Bureau of Investigation, the United States Department of Justice, and judges of the United states. The conduct of Veal, Watson, Haynes, and Camacho falls within the broad language of § 1512(b)(3).[16]

Furthermore, using this common definition does not lead to an absurd result. Veal, Watson, Haynes, and Camacho argue that acceptance of the plain language of the statute would federally criminalize every false statement made by anyone to any police officer. The clear language of the statute, however, negates that interpretation because of the statutorily prescribed federal nexus with federal agencies and judges. There is nothing irrational about a federal statute that seeks to prevent any person from perverting the truth-seeking function of investigative or judicial processes. See McLeod, 53 F.3d at

---

[16] As we have described previously, the misleading conduct by Veal, Watson and Haynes consisted of their false statements about their respective participation in the injuries that resulted in Mercado's death and their subsequent, collusive meeting at the police department. Camacho's misleading conduct was his presenting himself to a police technician and asking her to photograph his torn shirt, purportedly resulting from his involvement in the altercation with Mercado. The jury obviously believed that Camacho had torn his shirt and removed the pocket to convey the misleading impression that Mercado had been active and aggressive during the incident that resulted in his death.

324 (observing that interpreting 18 U.S.C. § 1513(a)(1) to prohibit retaliation against witnesses in civil as well as criminal suits does not lead to an absurd result).

Additionally, a plain-language reading of § 1512(b)(3) does not render the statute redundant, implausible, or inconsistent with other sections. Veal, Watson, Haynes, and Camacho rely on the caption or title of 18 U.S.C. § 1512 as evidence that Congress did not intend that persons with no pre-existing knowledge be included within the purview of this statute. To construe the statute, they urge the application of the doctrine of ejusdem generis, representing "that where general words follow a specific enumeration of persons or things, the general words should be limited to persons or things similar to those specifically enumerated." Turkette, 452 U.S. at 581, 101 S.Ct. at 2527 (determining ejusdem generis doctrine inapplicable, notwithstanding statutory title, in interpreting scope of the RICO statute). Consequently, Veal, Watson, Haynes, and Camacho argue that "another person" is constricted by the statutory title to mean "witness, victim, or informant."

36

The rule of ejusdem generis is "no more than an aid to construction and comes into play only when there is some uncertainty as to the meaning of a particular clause in a statute." Id. at 581, 101 S.Ct. at 2528. In declining to apply the principle of ejusdem generis to determine that only false statements that pervert governmental functions are encompassed by 18 U.S.C. § 1001, the Court stated that "it is not, and cannot be, our practice to restrict the unqualified language of a statute to the particular evil that Congress was trying to remedy–even assuming that it is possible to identify that evil from something other than the text of the statute itself." Brogan, ___ U.S. at ___, 118 S.Ct. at 809. By insisting that the statute be read in the most restrictive way, Veal, Watson, Haynes, and Camacho have attempted to create an uncertainty in the statute where none exists.

Nothing in the statutory language or the caption contains this artificial definition that they advance. The title states "witness"; it does not state or require that the witness have pre-existing knowledge. Significantly, police officers, as a consequence of their occupation, become witnesses as a matter of course in each investigation in which

they are involved.  Thus, the terms used in the statutory title do not exempt police officers.      The fact that Congress did not use restrictive language in drafting § 1512(b)(3) confirms our logical conclusion that "witness," as used in the caption, can be interpreted to encompass state investigators.  See United States v. Castro, 89 F.3d 1443, 1456 (11th Cir. 1996) (rejecting appellants' interpretation that "another" in 18 U.S.C. § 1346 is limited to nongovernmental victims and determining that the plain language of the statute and its legislative history support a nonrestrictive reading of "another" to include the state as well as all governmental entities), cert. denied, ___ U.S. ___, 117 S.Ct. 965 (1997); United States v. Yeatts, 639 F.2d 1186, 1189 (5th Cir. Unit B Mar. 1981) (interpreting "coin" in 18 U.S.C. § 485 in a nonrestrictive manner to include counterfeit coins that are not current legal tender).

Even if review of the legislative history were appropriate, it rejects the rule of ejusdem generis and discredits the restrictive view of the statute presented by Veal,  Watson, Haynes, and Camacho.   See Victim & Witness Protection Act of 1982, S. Rep. No. 97-532, at 18

(1982), reprinted in 1982 U.S.C.C.A.N. 2515, 2524. The Senate

Report evinces legislative intent to expand the existing "obstruction of

justice" statutory scheme by enacting § 1512.[17] Id. Expressing concern

that existing statutes failed to include various forms of obstructive

conduct, the Senate Committee stated its conclusion that §

1512(b)(3)[18] should be read in view of congressional recognition that

> the purpose of preventing an obstruction or miscarriage of
> justice cannot be fully carried out by a simple enumeration
> of the commonly prosecuted obstruction offenses. There
> must also be protection against the rare type of conduct that
> is the product of the inventive criminal mind and which also
> thwarts justice.

Id. (emphasis added). To reach such cases, the Senate Report states

that the Committee

> does not intend that the doctrine of ejusdem generis be
> applied to limit the coverage of [subsection (b)(3)]. Instead,
> the analysis should be functional in nature to cover conduct
> the function of which is to tamper with a witness, victim, or

---

[17] The version of 18 U.S.C. § 1503 in effect before 1982 had been the only statute which directly addressed attempts to influence or tamper with witnesses. The 1982 amendments revised § 1503 by excluding any reference to witnesses and limiting its scope to officers and jurors. Section 1512, entitled "Tampering with a witness, victim, or an informant," and § 1513, entitled "Retaliating against a witness, victim, or an informant," created an entirely new and broader set of obstruction of justice offenses.

[18] Subsection (b)(3) of 18 U.S.C. § 1512 was originally enacted and discussed in the Senate Report as subsection (a)(3).

> informant in order to frustrate the ends of justice. <u>For example, a person who induces another to remain silent or to give misleading information to a Federal law enforcement officer would be guilty under subsection [(b)(3)], irrespective of whether he employed deception, intimidation, threat, or force as to the person.</u>

<u>Id.</u> (emphasis added).

Thus, the Senate Report on subsection (b)(3) reveals that it is to be read to include a wide range of conduct that thwarts justice. The actions of Veal, Watson, Haynes, and Camacho fit within the Committee's discussion of proscribed conduct, which expressly includes activities designed to create witnesses as part of a cover-up and to use unwitting third parties or entities to deflect the efforts of law enforcement agents in discovering the truth. Veal, Watson, Haynes, and Camacho used deception to thwart the investigation into Mercado's death by creating false and misleading information, which they related to state investigators with the knowledge that this information would be relayed to and relied upon by other investigators. To ensure that they would be exonerated of any wrongdoing in Mercado's death, they further used police officers and personnel, such as the technician photographer of Camacho's shirt, who they either

40

knew would be or likely would be witnesses in the Mercado investigation, as conduits to create false and misleading evidence about the events resulting in Mercado's death. Cf. United States v. King, 762 F.2d 232 (2d Cir. 1985) (observing that § 1512(b)(3) should not have been charged because the alleged misleading conduct, outright subornation of perjury, did not involve any deceptive or misleading conduct). FBI agents who were investigating the possible commission of a civil rights crime were among the investigators who learned of and relied upon this contrived information and evidence provided by Veal, Watson, Haynes, and Camacho. It is clear that Congress intended § 1512(b)(3) to be used to punish deceptive methods of impeding justice and that it covers the conduct of these police officers.

2. Federal Nexus

Veal, Watson, Haynes, and Camacho also argue that their conviction for violating § 1512(b)(3) was improper because all that was charged in the indictment and proved at trial was that  false or contrived and misleading information was given to state investigators

41

with no knowledge or intent that this information would be communicated to <u>federal</u> authorities relative to a <u>federal</u> crime or investigation. Since the statute requires that a violator "hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense," they contend that their actions, however reprehensible and, perhaps, violative of state law,[19] did not have sufficient federal nexus to support their convictions for violating § 1512(b)(3). 18 U.S.C. § 1512(b)(3). Thus, they posit that their § 1512(b)(3) convictions cannot stand, not only because their false and misleading information was not directly communicated to federal agents, but also because there was no existing or imminent <u>federal</u> investigation of a crime of which they had specific knowledge and intended to hinder at the time that their subject actions occurred. They further argue that the district judge's instructions on § 1512(b)(3)

---

[19] A similar Florida statute, entitled "Tampering with a witness, victim, or informant," states that it is a crime to "knowingly . . . engage[] in misleading conduct toward another person . . . with intent to cause or induce any person to . . . [h]inder, delay, or prevent the communication to a law enforcement officer or judge of information relating to the commission or possible commission of an offense." Fla. Stat. 914.22(1)(e).

regarding this issue misled the jury and erroneously resulted in their convictions.

This federal nexus argument implicates the specific intent or mens rea requirements for violating § 1512(b)(3), which we must analyze in the proper statutory context. The district judge gave the following jury instruction, explaining the specific intent and conduct necessary to find a violation of § 1512(b)(3):

> In order to sustain its burden of proof as to this charge, count two, the Government must prove the following three essential elements beyond a reasonable doubt: First, that the defendant knowingly engaged in misleading conduct toward another person.
> Second, that the defendant did so with the intent to hinder, delay or prevent the communication to a law enforcement officer or Judge of the United States.
> And, third, that such information related to the commission or possible commission of a Federal offense.
>     . . . .
> [T]he Government does not need to prove any state of mind with respect to the circumstances that the Judge or law enforcement officer is an official or employee of the Federal Government. That is, the Government does not need to prove that the defendant knew that the law enforcement officer was a Federal law enforcement officer, or that the Judge was a Federal Judge, so long as the law enforcement officer or Judge is, in fact, a law enforcement officer or Judge of the United States. The term "law enforcement officer" simply means an officer or employee of the Federal Government, or a person authorized to act for or on behalf

43

of the Federal Government or serving the Federal Government as an advisor or consultant authorized under the law to engage in or supervis[e] the prevention, detection, investigation, or prosecution of an offense.

While the Government must prove, ladies and gentlemen of the jury, beyond a reasonable doubt that the defendant intended to hinder, delay or prevent the communication of information actually related to the commission or possible commission of a Federal offense, <u>the Government does not need to prove that the defendant knew that the offense was Federal in nature.</u>

R43-26, 28 (emphasis added).  At the outset, we recognize that the actions of Veal, Watson, Haynes, and Camacho on December 16 and 17, 1988, constituted intentional "misleading conduct" under § 1512(b)(3).[20] Our inquiry is whether they needed to know at the time of their conduct that their misleading information would be communicated

---

[20] The statutory, specific-intent definition of "misleading conduct" as it applies to § 1512(b)(3) and the conduct of Veal, Watson, Haynes, and Camacho is

(A) knowingly making a false statement;
(B) intentionally omitting information from a statement and thereby causing a portion of such statement to be misleading, or intentionally concealing a material fact, and thereby creating a false impression by such statement;
(C) with intent to mislead, knowingly submitting or inviting reliance on a writing or recording that is false, forged, altered, or otherwise lacking in authenticity;
(D) with intent to mislead, knowingly submitting or inviting reliance on a sample, specimen, map, photograph, boundary mark, or other object that is misleading in a material respect; or
(E) knowingly using a trick, scheme, or device with intent to mislead.

18 U.S.C. § 1515(a)(3).

to federal law enforcement agents or a federal judge or that their involvement in the Mercado incident was a federal crime. Therefore, we must analyze the specific intent and federal nexus requirements for violations of § 1512(b)(3) as opposed to violations 18 U.S.C. § 1503[21] and §§ 1512(a),[22] (b)(1), and (2),[23] the

---

[21] Entitled "Influencing or injuring officer or juror generally," § 1503 provides:

Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, magistrate judge, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished as provided in subsection (b). If the offense under this section occurs in connection with a trial of a criminal case, and the act in violation of this section involves the threat of physical force or physical force, the maximum term of imprisonment which may be imposed for the offense shall be the higher of that otherwise provided by law or the maximum term that could have been imposed for any offense charged in such case.

18 U.S.C. § 1503.

[22] Subsection 1512(a) provides:

(a)(1)Whoever kills or attempts to kill another person, with intent to–
    (A) prevent the attendance or testimony of any person in an official proceeding;
    (B) prevent the production of a record, document, or other object, in an official proceeding; or
    (C) prevent the communication by any person to  a law

statutes that Veal, Watson, Haynes, and Camacho argue are

analogous to § 1512(b)(3) and, thus, use to support their positions.

enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings;
shall be punished as provided in paragraph (2).

18 U.S.C. § 1512(a).

[23] Subsections 1512(b)(1) and (2) provide:

(b) Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to–
   (1) influence, delay, or prevent the testimony of any person in an official proceeding;
   (2) cause or induce any person to–
       (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;
       (B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;
       (C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or
       (D) be absent from an official proceeding to which such person has been summoned by legal process .
       . .
    . . . .
shall be fined under this title or imprisoned not more than ten years, or both.

18 U.S.C. §§ 1512(b)(1) & (2).

Congress has enacted numerous obstruction of justice statutes designed to criminalize a variety of conduct. See generally 18 U.S.C. §§ 1501-1517. These statutes contain distinct jurisdictional prerequisites necessary for invoking federal authority to prosecute specific conduct. Different clauses in § 1512 prescribe different bases upon which federal jurisdiction is predicated.

Sections 1512(a)(1)(A), (a)(1)(B), and (b)(2)(A)-(D) all require that the proscribed conduct occur in the context of an "official proceeding." Section 1515 defines "official proceeding" as a proceeding in any federal court, federal grand juries, congressional hearings, federal agencies, and interstate insurance. See 18 U.S.C. § 1515(a). In contrast, §§ 1512(a)(1)(C) and (b)(3), the subsection under which this case arises, contain a different jurisdictional basis: the defendant must have committed the obstructive conduct with the intent to "prevent," in § 1512(a)(1)(C), or "hinder, delay, or prevent," in § 1512(b)(3) communication to a federal law enforcement officer or judge information relating to the commission or possible commission of a federal crime. 18 U.S.C. § 1512(a)(1)(C) & (b)(3). Consistent with the

47

previously discussed legislative history, which evidences congressional intent to broaden the scope of the obstruction of justice scheme, the jurisdictional basis under these subsections is not limited to "official proceedings" as is the case with the remaining provisions of § 1512. Instead, federal jurisdiction under § 1512(b)(3) is based on the federal interest of protecting the integrity of potential federal investigations by ensuring that transfers of information to federal law enforcement officers and judges relating to the possible commission of federal offenses be truthful and unimpeded. By its terminology, § 1512(b)(3) does not depend on the existence or imminency of a federal case or investigation but rather on the possible existence of a federal crime and a defendant's intention to thwart an inquiry into that crime. As §§ 1512(a)(1)(A), (a)(1)(B), and (b)(2)(A)-(D) evidence, Congress could have limited the conduct proscribed in § 1512(b)(3) if that had been its intention.

The reliance of Veal, Watson, Haynes, and Camacho on United States v. Shively, 927 F.2d 804 (5th Cir. 1991), therefore, is misplaced. In Shively, defendants-appellants intimidated a witness by insinuating

harm to his family and, consequently, caused him to testify falsely at a deposition for a case pending in state court two and a half years before a federal grand jury indictment.  See id. at 810-11.  Because the criminal conduct in that case did not concern a federal "official proceeding" as required under § 1512(b)(1), the Fifth Circuit reversed the convictions.  Thus, the jury charge in that case is inapplicable to this case involving § 1512(b)(3).  The Fifth Circuit did note that the intimidation at issue in Shively well might have been within the ambit of § 1512(b)(3), which "speaks more broadly" because the limitation of "official proceeding" is absent.  Id. at 812.

Similarly, the Supreme Court's decision in United States v. Aguilar, 515 U.S. 593, 115 S.Ct. 2357 (1995), concerning a federal judge who gave false and misleading information to FBI agents during a grand jury investigation, does not assist Veal, Watson, Haynes, and Camacho.   That case involved the Court's consideration of the catchall provision of § 1503, which prohibits anyone from corruptly endeavoring to influence or obstruct "the due administration of justice."  18 U.S.C. § 1503(a).  The Court recognized that the federal nexus meant by "due

49

administration of justice" is that the obstructive act "have  a relationship in time, causation or logic with the judicial proceedings."  Aguilar, 515 U.S. at 599-600, 115 S.Ct. at 2362.  With respect to specific intent, the Court explained that "if the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct."  Id. at 599, 115 S.Ct. at 2362.

In terms of sufficiency of evidence to support Aguilar's conviction, the Court held that his false statements to an FBI agent were insufficient to meet that nexus in the absence of proof that he knew that such statements would be provided to a grand jury.  The request by Veal, Watson, Haynes, and Camacho that we superimpose the nexus requirement of "due administration of justice" in § 1503 onto the different federal nexus requirement of § 1512(b)(3) is misguided.  In Aguilar, the Court sought to place the phrase "due administration of justice" in the context of a legitimate federal interest that was consistent with the amorphous language used by Congress.   The Court determined that the phrase "due administration of justice" connotes the federal government's interest in preserving the integrity of

a judicial proceeding.  Other obstruction statutes, such as § 1512(b)(3) at issue in this case, implicate different federal interests, which specifically do not identify as the federal interest a federal judicial proceeding, pending or contemplated.[24]

Section 1512(b)(3), at issue in this case, does not connect the federal interest with an ongoing or imminent judicial proceeding or the defendant's knowledge of one.  Instead, the federal interest derives from the <u>character</u> of the affected activity, the <u>transmission</u> of information to federal law enforcement agents  and/or a federal judge concerning a possible federal crime.  Seeking to foster the communication of truthful, nonmisleading information to federal

---

[24] In § 1505, the federal interest derives from the nature of the affected proceeding, a federal agency or congressional committee, but the statute does not require that a proceeding be pending or contemplated.  The federal interest in § 1511 stems from the nature of the affected activity, state-regulated gambling enterprises, but there is no requirement of either an ongoing or imminent state or federal proceeding.  In the second and third clauses of § 1503, the federal interest comes from the status of the targeted person, a federal juror, but no judicial proceeding is required.  In §§ 1512(a)(1)(A)-(B), (b)(1), and (b)(2)(A)-(D), the federal interest is the status of the targeted person, potential witnesses in "official proceedings," but the statute expressly states that the proceeding "need not be pending or about to be instituted at the time of the offense." 18 U.S.C. § 1512(e)(1); see  United States v. Kelley, 36 F.3d 1118, 1128 (D.C. Cir. 1994) (concluding that, even where the statute requires proof of an "official proceeding," § 1512(e)(1) provides that the jury need only be able to infer reasonably that a criminal investigation, including a grand jury proceeding, might be instituted, not that one is pending or is about to be initiated when the obstructive conduct occurred).

authorities regarding a possible federal crime is the important federal interest that § 1512(b)(3) effectuates. Consequently, the specifically stated federal nexus in § 1512(b)(3), and not the Aguilar interpretation of the federal nexus in § 1503, controls our analysis of the scope of § 1512(b)(3). The district judge's instructions comported with § 1512(b)(3) by not requiring the jury to find the existence or imminency of an official federal proceeding.

Significantly, § 1512(f)(2) expressly states that, for purposes of § 1512 prosecutions, "no state of mind need be proved with respect to the circumstance"[25] that the law enforcement officer or judge is a federal agent or federal judge or serving as a federal advisor or

---

[25] As used in § 1512, "law enforcement officer"

> means an officer or employee of the Federal Government, or a person authorized to act for or on behalf of the Federal Government or serving the Federal Government as an advisor or consultant–
> > (A) authorized under law to engage in or supervise the prevention, detection, investigation, or prosecution of an offense; or
> > (B) serving as a probation or pretrial services officer under this title[.]

18 U.S.C. § 1515(a)(4). Because of the concurrent jurisdiction of state and federal authorities in such areas as drug interdiction and homocides as well as their common goal of law enforcement, we recognize that state police officers can serve as advisors or consultants to federal agents in the "prevention, detection, investigation, or prosecution" of various federal crimes. Id. at § 1515(a)(4)(A).

consultant.   18 U.S.C. § 1512(f)(2).  For violation of § 1512(b)(3),  it is sufficient if the misleading information is <u>likely</u> to be transferred to a federal agent.[26]    All that was required for Veal, Watson and Haynes's violation of § 1512(b)(3) was the <u>possibility</u> or <u>likelihood</u> that their false and misleading information would be transferred to federal authorities irrespective of the government authority represented by the initial investigators.[27]  <u>See</u> <u>United States v. Fortenberry</u>, 971 F.2d 717, 719,

---

[26] In the context of similarly worded 18 U.S.C. § 1512(a)(1)(C), which  refers to an individual who "kills or attempts to kill another person, with intent to . . . prevent the communication by any person to a law enforcement officer" or federal judge "of information relating to the commission or possible commission of a Federal offense," other circuits have concluded that possible or potential communication of information to federal authorities is sufficient.  <u>Id.</u>; <u>see, e.g.</u>, <u>United States v. Stansfield</u>, 101 F.3d 909, 918 (3d Cir. 1996) (holding that communication to any  person who "<u>might</u> communicate with the <u>federal</u> authorities" was sufficient for violation of § 1512(a)(1)(C) (first emphasis added)); <u>United States v. Romero</u>, 54 F.3d 56, 62 (2d Cir. 1995), <u>cert. denied</u>, 517 U.S. 1149, 116 S.Ct. 1449 (1996) ("There need not be an ongoing investigation or even any intent to investigate.  Rather, the killing of an individual with the intent to frustrate the individual's <u>possible</u> cooperation with federal authorities is implicated by the statute."  (emphasis added)); <u>United States v. Edwards</u>, 36 F.3d 639, 645 (7th Cir. 1994) (holding that the essential mental state for violation of §  1512(a)(1)(C) is that "the defendant <u>believed</u> that a person  <u>might</u> furnish information to federal officials and that he killed or attempted to kill that person in order to prevent such disclosure" (second emphasis added)); <u>United States v. Galvan</u>, 949 F.2d 777, 783 (5th Cir. 1991) ("[T]he statute focuses on the defendant's intent: whether she thought she <u>might</u> be preventing [the witness's] future communication of information" (emphasis added)); <u>see also</u> <u>United States v. Leisure</u>, 844 F.2d 1347, 1364 (8th Cir. 1988) ("[I]t is only necessary for a defendant to have <u>believed</u> that a witness <u>might</u> give information to federal officials, and to have prevented this communication, to violate 18 U.S.C. § 1510." (emphasis added)).

[27] On appeal, Veal, Watson and Haynes restate in jurisdictional terms their contention that § 1512(b)(3) is inapplicable because their false and misleading statements concerning the circumstances of Mercado's death were made to state, not federal, investigators.  As we have explained, the possibility that their false and misleading statements regarding their involvement

720 n.9 (11th Cir. 1992) (affirming § 1512(b)(3) conviction for physically threatening a witness to prevent statements concerning unlawful firearm possession in violation of 18 U.S.C. § 922(g), which was discovered and investigated by local police before federal officials became involved).

Likewise, § 1512(b)(3) does not require that a defendant know the federal nature of the crime about which he provides information because the statute criminalizes the <u>transfer</u> of misleading information which actually relates to a potential federal offense, regardless of whether the communicator of such information knows or believes that the crime about which he knowingly provides false or misleading information is federal.[28]  Indeed, it would be ironic if congressional intent to ensure the integrity of investigations into possible federal crimes could be defeated simply by a defendant's ignorance, feigned

---

in Mercado's death would be transmitted to federal authorities was sufficient for violation of § 1512(b)(3).

[28] Based on evidence that defendant-appellant's threats of physical harm to witnesses to prevent them from communicating information relating to the commission or possible commission of a federal crime to law enforcement officers, the Tenth Circuit held that "a threat does not necessarily have to succeed and cause the person threatened to refrain from giving information to law enforcement officers" for § 1512(b)(3) to be violated.  <u>United States v. Dunning</u>, 929 F.2d 579, 581 (10th Cir. 1991).

or real, about the federal character of the crime. As the district judge determined, the statute provides that one who transmits misleading information with the intent to hinder, delay or prevent the communication of information to a law enforcement officer or judge is accountable under § 1512(b)(3) when the false or misleading information relates to a potential federal crime and that information does reach a federal agent or judge.

By its plain wording, § 1512(b)(3) is designed to ensure that information received by federal investigators or judges regarding a potential federal crime be correct, truthful, and complete to facilitate a full and fair investigation and adjudication. It is irrelevant to that inquiry whether the person who provides false or misleading information that ultimately becomes relevant to a federal investigation intended that a federal investigator or judge receive that information; it is only relevant that a federal investigator or judge received it. See Fortenberry, 971 F.2d at 720 n.9. In this case, the evidence established that a federal agency, the FBI, received the misleading information in the course of its investigation of a possible civil rights violation that resulted in

55

Mercado's death.  The exclusion of any requirement that the defendant know that the misleading information that he provides will be communicated to an official with federal authority negates the specific intent <u>mens rea</u> urged by Veal, Watson, Haynes, and Camacho. Because the district judge correctly interpreted § 1512(b)(3) as it was charged relative to the facts in this case, his denials of Veal, Watson, Haynes, and Camacho's pretrial motions to dismiss Count II as well as their post-trial motions challenging the jury instructions were proper.

## C. Sufficiency of the Evidence

Veal, Watson, Haynes, and Camacho argue that the evidence was insufficient to support their convictions for violating § 1512(b)(3), both as to their conduct or <u>actus reus</u> and specific intent or <u>mens rea</u>. The district judge denied their post-trial motions requesting acquittal notwithstanding the verdict or,  alternatively, for a new trial, wherein they raised the same arguments.  To the extent that they argue that their acquittal on Count I, alleging conspiracy to violate 18 U.S.C. §§ 1503 and 1512, establishes insufficiency of the evidence to support their convictions on Count II, their argument improperly conflates the

distinction between insufficiency of the evidence and inconsistent verdicts. The Supreme Court has explained that "[s]ufficiency-of-the evidence review involves assessment by the courts of whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt," a review that is "independent of the jury's determination that evidence on another count was insufficient." United States v. Powell, 469 U.S. 57, 67, 105 S.Ct. 471, 478 (1984). Thus, Veal, Watson, Haynes, and Camacho's acquittal on Count I is irrelevant to our singular focus and determination of whether the evidence adduced at trial supports their convictions under Count II for violation of § 1512(b)(3). See United States v. Church, 955 F.2d 688, 695 (11th Cir. 1992) (recognizing that inconsistent verdicts do not defeat a defendant's conviction).

We review challenges to sufficiency of the evidence de novo and assess the evidence in the light most favorable to the prosecution. See United States v. Suba, 132 F.3d 662, 671 (11th Cir. 1998). We make all reasonable inferences and credibility choices in favor of the jury's verdict as we evaluate the evidence to determine whether "'any

57

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Id. (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979)). To prove a violation of § 1512(b)(3), the government must establish beyond a reasonable doubt that the defendant knowingly and willfully (1) engaged in misleading conduct toward another person, (2) with the intent to hinder, delay or prevent the communication of information to a federal law enforcement officer or federal judge, (3) about the commission or the possible commission of a federal crime. See 18 U.S.C. § 1512(b)(3).

We have explained that "another person" is unrestricted and includes the state investigators, who were the conduit for relaying false and misleading information imparted to them by Veal, Watson and Haynes to federal authorities. Furthermore, because § 1512(f) provides that no state of mind is needed for violation of § 1512(b)(3), we have explained that the officers did not need to know that their false and misleading statements would be relayed to federal authorities, the FBI, or that their actions constituted a federal crime at the time of their conduct. Pursuant to the district judge's accurate instructions on these

elements of violation of § 1512(b)(3), our focus in analyzing the sufficiency-of-the-evidence arguments will be on the actus rea, or Veal, Watson, Haynes, and Camacho's intentional actions.

1. Veal, Watson and Haynes

The culpability of Veal, Watson and Haynes is based on their December 17, 1988, statements wherein they disavowed touching Mercado, observing any contact with him, or having any knowledge of the cause of his injuries[29] and also denied meeting at the police department after Mercado's death to discuss the incident.[30] The trial evidence revealed that, by the time that Veal, Watson and Haynes made their statements at approximately 2:00 A.M. on December 17, 1988, they knew that Mercado was dead. They also knew that the state investigators who questioned them were obtaining information about how Mercado received the injuries that resulted in his death. Veal, Watson and Haynes unequivocally avowed that, when they

---

[29] The indictment identifies these statements as Overt Acts I, J and K. See R1-1-6-7.

[30] The indictment identifies these statements as Overt Acts F, G and H. See R1-1-6.

59

entered Mercado's residence, the struggle was over and that the injured Mercado was lying on the floor.

Nevertheless, reasonable jurors could disbelieve those statements based upon the blood-spatter evidence, which conclusively placed Veal, Watson, Haynes, and Camacho at the scene at the time of Mercado's fatal injuries. Although Veal professed noninvolvement, the blood-spatter evidence showed that he had struck Mercado multiple times using medium to medium-high force and that he was present when others struck Mercado. Similarly, that evidence showed that Watson had kicked Mercado in the head with his shoe as many as four times and that he knew that officers other than Camacho also had kicked Mercado. The blood-spatter evidence additionally revealed that Haynes kicked Mercado in the face at least once and that he was present when others struck Mercado.

Although Veal, Watson and Haynes portrayed themselves as being ignorant of any attempt to discuss collectively the Mercado incident in a meeting at the police station, apparently to coordinate their stories, the jurors reasonably could have believed the testimonies

60

of various eyewitnesses that these three officers and Camacho had met behind closed doors at the police department after the incident. Reading Veal, Watson and Haynes's strikingly similar statements together, the jurors fairly could have decided that the officers colluded to create the impression that they were innocent bystanders who came upon the scene after the altercation and that they had not been involved in any efforts to distort the true facts. The jurors reasonably could have concluded that, by intentionally omitting and concealing important, relevant information about their conduct concerning Mercado from the investigators and, thus, creating a false impression about what had actually occurred, Veal, Watson and Haynes's statements concerning their involvement in the altercation with Mercado as well as their subsequent meeting at the police department were false and misleading and constituted "misleading conduct" within the meaning of § 1512(b)(3), which resulted in their convictions.

2. Camacho

Camacho argues that evidence regarding his ripped shirt and his presentation of it to police technician Romans for photographing is

61

insufficient to constitute misleading conduct with intent to hinder or prevent the communication of information to law enforcement personnel.[31] To the contrary, this evidence fits within the proscriptions of § 1512(b)(3), where applicable "misleading conduct" includes "knowingly submitting or inviting reliance on a[n] . . . object that is misleading in a material respect; or knowingly using a trick, scheme, or device with intent to mislead." 18 U.S.C. § 1515(a)(3)(D)-(E). The jurors reasonably could have concluded that Camacho deliberately tore his shirt after he returned to the police station with the intent to convey to investigating officers a distorted impression about the nature and manner of the altercation that resulted in Mercado's death. Additionally, the jurors rationally could have determined that Camacho fabricated an exculpatory explanation about the circumstances that led to Mercado's violent death by tearing his shirt.

Camacho asked Romans to photograph his shirt under circumstances that logically would lead any investigator who received

---

[31] The conduct with which Camacho was charged under the indictment as misleading under Count II identifies these actions involving the torn shirt and presentation for photographing as Overt Act S as well as Camacho's false claim over the police radio that the butcher knife was still inside Mercado's residence as Overt Act N. See R1-1-8, 7.

the photographs to believe that the condition of the shirt was a direct result of the altercation with Mercado and, thus, to arrive at erroneous conclusions about the nature of the incident.[32] Jurors reasonably could have determined that Camacho deliberately tore his shirt to create exculpatory evidence because of: the undisputed fact that the shirt was undamaged at the scene after the altercation; the suspect and surreptitious manner in which the shirt came to be damaged at the police station; Camacho's presentation of himself and his shirt to Romans who typically takes such pictures to document injuries to officers in "control" situations; the pictures taken of Camacho inside the lieutenant's office, which clearly were intended to show that Camacho's shirt had been damaged during a fight with Mercado; the forensic evidence, which contradicts the impression that Camacho attempted to create of how the shirt was damaged as an item of evidence pertinent to the control investigation; and the fact that

---

[32] It is irrelevant that Camacho did not expressly ask Romans, or anyone else, to rely on the shirt and the photographs of it because this evidence inevitably would have been part of the investigation into Mercado's death. Similarly, it is irrelevant whether Camacho initiated asking Romans to photograph his shirt or whether this was standard procedure in the police department following a "control" situation, as he contends. Either way, he knew that the pictures would be used to document the incident involving Mercado, and he created false and misleading evidence by defacing his shirt within the meaning of § 1512(b)(3) and § 1515(a)(3).

Camacho, a veteran police officer, knew that any photographs taken of him following his participation in a control situation would be relied upon by investigators in their efforts to determine the cause of Mercado's death at his residence. Therefore, the jurors logically could have inferred that Camacho devised altered and misleading physical evidence, his ripped shirt, which was a critical and falsely exculpatory component in the investigation of Mercado's death, and concluded that he violated § 1512(b)(3).

**D. Jury Instructions Regarding Materiality**

Veal argues that the district judge improperly instructed the jury regarding materiality because he informed the jurors that materiality was a legal question for the court to decide in contradiction of United States v. Gaudin, 515 U.S. 506, 115 S.Ct. 2310 (1995), which reallocated the determination of the materiality of a false statement under 18 U.S.C. § 1001[33] from the judge to the jury. We have

---

[33] Under § 1001, construed in Gaudin,

whoever, in any manner within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully-
    (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;
    (2) makes any materially false, fictitious, or fraudulent statement

extended <u>Gaudin</u> to all cases where materiality is an element of the offense.  See <u>United States v. De Castro</u>, 113 F.3d 176, 178 (11th Cir. 1997).  The determination of whether materiality is an element of a particular crime is a question of law reviewed <u>de novo</u>.  See <u>id.</u>

For cases on direct appeal at the time that it was decided, such as this case, <u>Gaudin</u> applies retroactively.  See <u>United States v. Fern</u>, 117 F.3d 1298, 1307 (11th Cir. 1997) (citing <u>Griffith v. Kentucky</u>, 479 U.S. 314, 328, 107 S.Ct. 708, 715 (1987)).  We review for plain error when the purported error on appeal is the result of a subsequent Supreme Court decision and no error was asserted at trial.[34]  See <u>id.</u> Our review of the record reveals that the materiality definition, which Veal contests, was discussed at the charge conference and given at

---

or representation; or
(3) makes or uses any false writing or document knowing the same
to contain any materially false, fictitious, or fraudulent statement
or representation; or
(3) makes or uses any false writing or document knowing the same
to contain any materially false, fictitious, or fraudulent statement
or entry;
shall be fined under this title or imprisoned not more than 5 years, or both.

18 U.S.C. § 1001(a).

[34] Plain error review, applicable to alleged <u>Gaudin</u> errors when  no objection was made at trial, consists of an error being both plain and affecting substantial rights.  See <u>Fern</u>, 117 F.3d at 1307.

trial in the context of the pending perjury counts alleging violation of 18 U.S.C. § 1623, Counts III, IV, VI through IX.[35] The defendants were acquitted on all of these counts, which makes the instructions relative to the perjury counts irrelevant to the instructions concerning § 1512(b)(3), the only count of conviction.

The only reference to "material" in the district judge's instructions concerning § 1512(b)(3) occurred in the definition of "misleading conduct" from § 1515(a)(3)(B), where the adjective "material" modifies "fact" and "respect."[36] Veal has presented an unwarranted extrapolation from the

---

[35] Concerning the perjury counts, the district judge instructed:

> Now, with regard to "materiality," the materiality of the matter involved in the alleged false testimony is not a matter with which you are concerned, but, rather, is a question for the Court to decide. You are instructed that the questions asked of a defendant, as alleged in each of the respective counts, constitute[] material matters in the court proceedings referred to in the Indictment.

R43-30.

[36] With regard to "misleading conduct" within the meaning of § 1512(b)(3), the district judge instructed the jury as follows:

> [F]or the purposes of this offense charged in count two, you are instructed that the term "misleading conduct" means the following: A, knowingly making a false statement, or, B, knowingly . . . intentionally omitting information from a statement and thereby causing a portion of such statement to be misleading, or intentionally concealing a <u>material</u> fact, and thereby creating a false impression by such statement, or, C, with intent to mislead, knowingly submitting or inviting reliance on a writing or recording that is false, forged, altered, or otherwise lacking in authenticity, or, D, with intent to mislead, knowingly submitting or inviting reliance on a sample, specimen, map, photograph, boundary mark or

district judge's "materiality" instruction relating to the perjury counts under §

1623 and misrepresented that instruction as being applicable to the §

1512(b)(3) instruction, which references "material fact" and "material

respect."[37]  We recognize the similarity between a violation of § 1001 for

false statements in a matter within the jurisdiction of a federal department or

agency and a violation of § 1512(b)(3) for misleading conduct that obstructs

a federal law enforcement officer or judge from knowing the true facts

relating to the commission or possible commission of a federal crime.  Cf.

United States v. Klais, 68 F.3d 1282, 1283 (11th Cir. 1995) (per curiam)

(holding that Gaudin does not apply to 18 U.S.C. § 922(a)(6), which uses

"'material' in an  entirely different manner" from § 1001, and that the district

---

other object that is misleading in a <u>material</u> respect, or, finally, E, knowingly
using a trick, scheme, or device with intent to mislead.

R43-27 (emphasis added); <u>see</u> 18 U.S.C. § 1515(a)(3)(B) & (D) (defining "misleading conduct" for purposes of § 1512 <u>inter alia</u> as "intentionally concealing a <u>material</u> fact" and "with intent to mislead, knowingly submitting or inviting reliance on . . . [an] object that is misleading in a <u>material</u> respect" (emphasis added)).

[37]  Veal incorrectly represents that "[t]he court followed the definition of misleading conduct <u>immediately</u> with the instruction that materiality is a matter for the court to decide and not a question for the jury."  Appellant Veal's Brief at 33 (emphasis added).  While the instruction defining misleading conduct occurs within the district judge's instructions for Count II concerning § 1512(b)(3), the materiality instruction occurs not immediately thereafter, but subsequently, within the judge's instructions for Counts III, IV, VI-IX regarding § 1623.  The two instructions are unrelated and not intertwined such that they would have been confusing to the jurors.

judge properly did not submit the question of materiality to the jury), <u>cert. denied</u>, ___ U.S.___, 117 S.Ct. 94 (1996).   Nevertheless, Veal's <u>Gaudin</u> argument fails because, following the district judge's instructions for Count II, to which there was no objection at the charge conference or at trial, the jury and not the district judge made the decision regarding whether the officers' actions constituted "misleading conduct" under § 1512(b)(3). Accordingly, Veal's <u>Gaudin</u> challenge to the  § 1512(b)(3) jury instruction regarding materiality is meritless.

### III. CONCLUSION

Veal, Watson, Haynes, and Camacho, experienced  narcotics police officers, have presented various issues in an effort to overturn their convictions under § 1512(b)(3) for engaging in misleading or obstructive conduct relating to the federal investigation of the death of Mercado, a drug dealer.   Veal, Watson and Haynes contest the admission in the obstruction case of their statements suppressed by the same district judge in their previous trial for violating Mercado's civil rights.  All challenge the district judge's  interpretation and application of § 1512(b)(3) as well as the sufficiency of the evidence to support

their convictions.  Veal  argues that <u>Gaudin</u> precludes the district judge's jury instructions on materiality.  For the reasons explained herein, we AFFIRM their convictions.