In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-2374

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAMES HARRY RAND, also known as Harry Rand,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 CR 1069—**Joan B. Gottschall**, *Judge.*

ARGUED FEBRUARY 7, 2007—DECIDED APRIL 6, 2007

Before FLAUM, ROVNER, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* An incredibly bizarre plot—
seemingly doomed to failure from the start—unraveled
with tragic consequences: the death of an innocent man
and a life sentence for the defendant in this case, James
Rand.

Rand, unfortunately, was a friend of a fellow named
Joseph Kalady. And Kalady was in hot water. To extricate
himself, he hatched a plan he thought would allow him
escape from both the heat and the country. Kalady re-
cruited Rand to help him pull it off. Nothing but trouble
followed: on this appeal, Rand challenges his conviction
for violating 18 U.S.C. § 1512(a)(1)(C), a statute entitled

"Tampering with a witness, victim, or an informant." Although Rand maintains his innocence to this day, we start our consideration of his appeal with the facts, which we must accept as true, that were established during his 2005 jury trial.

In the fall of 2001, Kalady was arrested for executing an identity fraud scheme in which he counterfeited U.S. birth certificates to obtain passports for illegal aliens. He was released on bond but confined to his home and monitored by an electronic bracelet around his ankle. Under the terms of his release, he had to remain within 500 feet of his residence unless he had permission from a Pretrial Services officer to go beyond that distance. Kalady's arraignment was delayed due to problems with his health, but it was ultimately scheduled for December 6, 2001.

Kalady was a huge man, weighing in at 450 pounds, and he suffered serious health problems as a result of his weight. Like most all defendants facing federal criminal charges, he did not want to go to prison. So in November 2001, as the date for his arraignment drew close, he told his brother, Michael, that he wanted to fake his own death so he could get out of his predicament. Kalady's plan, ultimately, was to kill another person and use the corpse as a double for himself.[1]

Kalady discussed his plan with Rand, who had previously lived with him. During the discussion, Kalady told Rand to "get a homeless guy, kill him, and pretend that he's me." Kalady also asked Rand to find a homeless man who looked like Kalady, someone who visited "soup

---

[1] This plan was not even as bizarre as two others Kalady discussed but rejected: one was to buy a cadaver, place it in his house, and then set the house on fire; another was to have a Nigerian friend (this was soon after 9-11) crash a small airplane into Kalady's house.

kitchens or missions" so Kalady could use the body to "replace" his own. Kalady suggested that Rand go to places where "bums go" since they didn't have families looking after them. Rand agreed to find someone Kalady could use to pull off his scheme.

Kalady also discussed his plan with Michael, asking him to do several things. First, Kalady said that if Michael came to his residence and found a dead body in his chair, he should tell everyone that the corpse was Joseph Kalady. Next, Kalady asked Michael to call the police, paramedics, and funeral directors to report his discovery of the dead body. Finally, on November 27, 2001, Kalady asked Michael to come to his house and serve as a witness on documents provided by the Cremation Society of Illinois. The execution of these documents, with a witness, ensured that the body would be cremated after it was removed from Kalady's house. This was a crucial part of Kalady's plan because if the body found in his chair was cremated, "it would become [Kalady] and they wouldn't be able to send him back to prison."

On December 1, 2001, 5 days before the scheduled arraignment, Rand brought a fellow named William White to Kalady's house. Kalady told White that he needed a body double because the FBI was watching him. He asked White if, at a later time, he would be willing to put on Kalady's clothes and sit in his chair for a couple of hours so Kalady could leave without alerting federal authorities. White agreed, and Kalady then gave White and Rand $150 in cash. After White and Rand left the apartment, Kalady told Michael that he thought his plan "would work" and that White's body would be a good "replace[ment]" for Kalady's. The next day, Michael went to Kalady's house and found White dead, wearing Kalady's clothing and sitting in Kalady's oversized recliner. Rand was seen leaving Kalady's residence around that time.

As Robert Burns observed, the best-laid plans of mice and men often go awry. And this plan, which was hardly best-laid, quickly unraveled when the authorities realized the body, by then at the morgue, was not Joseph Kalady. This apparently was not all that difficult as White, at 185 pounds, was less than half of Kalady's size.

After Rand was arrested, he admitted that Kalady wanted somebody to take his place and sit in his chair while Kalady left the house. Rand also admitted Kalady told him to get a homeless guy, kill him, and have that guy take Kalady's place.

Rand was charged and went to trial on two counts. Count 1 charged him with aiding and abetting Kalady in the murder of White, under § 1512(a)(1)(C). The statute provides:

> Whoever kills . . . another person, with intent to . . . prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of . . . release pending judicial proceedings; shall be punished [according to law].

Count 2 charged Rand with conspiring with Kalady and others "to commit an offense against the United States; namely, the failure by defendant Joseph Kalady to appear . . . for arraignment . . . as required by the conditions of Joseph Kalady's release order, in violation of Title 18, United States Code, Section 3146(a)(1)." A jury found Rand guilty on both charges. He was sentenced to a life term on the first count and a concurrent 5-year term on the second count. His appeal is limited to challenging his conviction on the first count.

The government's theory of the case was that Kalady, aided and abetted by Rand, killed White intending to

prevent a Pretrial Services officer from communicating to the court that he violated his conditions of release by leaving his house. Rand argues that § 1512 does not apply to these facts—it is plainly addressed, he says, to what is commonly understood to be witness tampering. He argues that because White was not "a witness, victim or informant," his killing by Kalady is not a violation of the statute.

Rand also argues that even if Kalady's scheme is seen as an effort to prevent the fact of his flight from being known, § 1512(a) only deals with efforts to conceal information as to *prior* crimes. It is not violated where a killing is actually a *new* crime. Finally, Rand argues that flawed jury instructions led to his conviction.

Kalady clearly murdered White and, viewing the evidence in the light most favorable to the government, Rand clearly aided and abetted that nefarious act. But did Rand violate § 1512? We think the answer is "yes."

Rand argues that the statute, on these facts, only prohibits the killing of victims, witnesses, and informants, and because White does not fall into any of these categories, his killing does not fit under the statute. This argument, we think, ignores the plain language of the statute.

We repeat, this time with emphasis, the text of the statute:

(a)(1) Whoever kills or attempts to kill *another person*, with intent to—

> (C) prevent the communication by *any person* to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of . . . release pending judicial proceedings;

Count 1 of the indictment against Rand tracked the language of § 1512(a)(1)(C). It charges that Rand (with Michael Kalady and others) aided and abetted the violation:

> with the intent to prevent the communication by a United States Pretrial Services Officer to a law enforcement officer and judge of the United States of information relating to the commission and possible commission of a Federal offense and a violation of defendant Joseph Kalady's conditions of release pending judicial proceedings, which killing was a murder in the first degree, as defined in Title 18, United States Code, Section 1111.

We believe that a plain reading of § 1512(a)(1)(C) demonstrates that the murder victim does not have to be a witness or an informant. The statute makes it a federal crime to kill or attempt to kill "*another person*"—regardless of who that person is—in order to prevent the communication of information by "*any person*" to the court. The statute does not only provide that it is a federal crime to kill another person in order to prevent *that* person from communicating information to the court.

Rand's two principal contentions are that there must be some relationship between the person killed and the person whose "communication" is prevented, and that the statute's title—Tampering with a witness, victim, or an informant—cabins its scope. Both claims must be rejected. Because the plain language of the statute—killing "another person" to prevent a communication by "any person"—is not limited, Rand turns to a variant of the old legislative history argument to support his claim. He says: "While extrinsic material may not modify an unambiguous statute, it should be considered in determining the meaning of the statute." We cannot embrace this notion. When a statute is clear, any consideration of

legislative history is improper.[2] *See*, *e.g.*, *Holder v. Hall*, 512 U.S. 874, 932 n.28 (1994) ("Resort to legislative history is only justified where the face of the [statute] is inescapably ambiguous.") (quotation omitted); *see also United States v. Hayward*, 6 F.3d 1241, 1245 (7th Cir. 1993) (holding that "when the language of a statute is clear and unambiguous, no need exists for the court to examine the legislative history, and the court must give effect to the plain meaning of the statute").

Rand claims that the title of the statute, again "Tampering with a witness, victim or an informant," reveals that its sole purpose is preventing harm to witnesses, victims, and informants. However, while a statute's title can inform the meaning of ambiguous text, it is well-settled that it does not "limit the plain meaning of the text." *See United States v. Krilich*, 159 F.3d 1020, 1028 (7th Cir.

---

[2] Although we are not moved by Rand's argument that we should turn to legislative history to discern the meaning of the statute, we note that the history certainly is not a slam dunk in his favor. As the government notes, the Senate Report seems to urge a wide reach for the law:

> [T]he obstruction of justice statute is an outgrowth of the Congressional recognition of the variety of corrupt methods by which the proper administration of justice may be impeded or thwarted, a variety limited only by the imagination of the criminally inclined. In the Committee's view, this observation leads to the conclusion that the purpose of preventing an obstruction or miscarriage of justice cannot be fully carried out by a simple enumeration of the commonly prosecuted obstruction offenses. *There must also be protection against the rare type of conduct that is the product of the inventive criminal mind and which also thwarts justice.*

Victim & Witness Protection Act of 1982, S. Rep. No. 97-532, at 18 (1982).

1998), citing *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998); *see also Lyons v. Georgia-Pacific Corp. Salaried Employees*, 221 F.3d 1235, 1246 (11th Cir. 2000) ("[R]eliance upon headings to determine the meaning of a statute is not a favored method of statutory construction.").

Our view is consistent with the position taken by the Eleventh Circuit in *United States v. Veal*, 153 F.3d 1233 (1998). In *Veal*, three police officers were charged under 18 U.S.C. § 1512(b)(3) with trying to head off federal charges by misleading state authorities concerning the circumstances of a victim's death in order to prevent state authorities from providing the FBI and a federal judge with information concerning the killing. On appeal, the officers argued that § 1512 was directed solely at the direct victim or witness, rather than third parties such as the state authorities, and that they therefore could not be charged with violating the statute. In partial support of their argument, the officers pointed to the statute's title.

The *Veal* court held that it did not need to reach the statute's legislative history because "there [was] no ambiguity in [§ 1512(b)(3)'s] 'another person,' which is easily and commonly understood to mean *any* person, regardless of whether he possessed knowledge of the commission or possible commission of a federal crime from being an eyewitness or investigating official." *Id.*, at 1245 (emphasis in original); *see also United States v. Diaz*, 176 F.3d 52, 91 (2d Cir. 1999) (relying on an opinion analyzing § 1512(a)(1)(C) in considering claims under § 1512(b)(3) because the elements of the subsections of § 1512 are similar), *cited in United States v. Baldyga*, 233 F.3d 674, 680 n.5 (1st Cir. 2000) (comparing § 1512(b)(1) to § 1512(a)(1)(C)).

Rand cites *United States v. Arocho*, 305 F.3d 627, 639 (7th Cir. 2002), and *United States v. LaShay*, 417 F.3d 715,

718 (7th Cir. 2005), for the contention that a person killed under a § 1512 prosecution must also be a witness. While both cases held that a witness killing qualifies for prosecution under § 1512, neither went so far as to mandate that the victim *must* be a witness. Likewise, Rand argues that *United States v. Murphy*, 406 F.3d 857 (7th Cir. 2005), held that § 1512 only "reaches crimes against a person where the defendant knew the person harmed was a witness or informant." We disagree.

In *Murphy*, one of the defendants—a woman named Baker—confronted a confidential informant, but she did not know that the person held that status. We agreed in that case that the jury could not convict Baker when she did not know the person she confronted was an informant. But our reasoning was very particular. Since Baker did not know the person she confronted was an informant, she lacked the required intent under § 1512 of acting to prevent a communication to a federal law enforcement officer or judge. Our case is fundamentally different because Kalady had the requisite intent required under the statute. He killed White pursuant to a plan to make the authorities think the dead person was him so that the Pretrial Services officer would not communicate to the judge that he had fled to avoid prosecution. By aiding Kalady, Rand exposed himself to prosecution under the statute as well.

Rand's argument that § 1512 only relates to "prior" crimes is similarly unavailing. The statute includes potential crimes by punishing whoever kills another person with the intent to prevent the communication by any person to a law enforcement officer or judge "relating to the commission or *possible* commission" of a federal crime. Rand says that if the statute reaches future crimes, it will create "an absurdly broad" scope, such that every killing of any person during any crime could be a violation of § 1512. This argument ignores the intent

requirement that distinguishes § 1512. In order to fall under the statute, a defendant must kill (or attempt to kill) another person with the intent to "prevent the communication" of information "by any person" to a law enforcement officer or judge. So limited, every murder of any person will not lead to a charge under § 1512.

Rand's challenge to the jury instructions regarding the elements of the charge against him is an offshoot of his contention about the limited scope of § 1512. The judge's instructions, however, appropriately tracked the statute and the indictment. Since White's killing, which Rand aided and abetted, was a murder, § 1512(a)(3), which establishes the punishment, provides:

> (3) The punishment for an offense under this subsection is—
>
> (A) in the case of murder (as defined in section 1111 [18 USCS § 1111], the death penalty or imprisonment for life, and in the case of any other killing, the punishment provided in section 1112 [18 USCS § 1112];
>
> (B) in the case of—
>
> > (i) an attempt to murder; or
> >
> > (ii) the use or attempted use of physical force against any person;
> >
> > imprisonment for not more than 20 years; and
>
> (C) in the case of the threat of use of physical force against any person, imprisonment for not more than 10 years.

18 U.S.C. § 1512(a)(3). The government proceeded under subsection (3)(A), and as a result, the instructions had to provide a definition of murder. That definition came from 18 U.S.C. § 1111, the federal murder statute.

As charged, the government had to prove, beyond a reasonable doubt, three elements to secure a conviction. First, that Rand aided and abetted in White's killing. This element is reflected in instruction 18 ("the government must prove . . . that the defendant aided and abetted the murder of William White") as given.

Second, the government had to prove that White was killed in order to prevent a communication by "any person" to a law enforcement official or judge. This element is reflected in instruction 18 as well ("the government must prove . . . that Joseph Kalady killed William White with the intent to prevent the communication by a United States Pretrial Services Officer to a law enforcement official and judge of the United States of information relating to the commission and possible commission of a Federal Offense and a violation of Joseph Kalady's conditions of release pending judicial proceedings.").

Lastly, for sentencing purposes, the government had to prove that White's killing was "murder," as defined in § 1111, in order to subject Rand to a sentence of life imprisonment. This element was reflected in instruction 18 ("the government must prove . . . that Joseph Kalady's killing of William White was murder in the first degree . . . .").

Admittedly, the charge in this case and the instructions formulated and given by the experienced district court judge (the Honorable Joan B. Gottschall) are not run-of-the-mill. And that's certainly not unusual in a case that was anything but run-of-the-mill. We think these instructions are clear and did not, as Rand colorfully claims, toss the jury into an "instructional briar patch."

Rand, of course, would have preferred his proposed elements instruction:

　　[T]hat defendant intentionally "aided and abetted" Joseph Kalady in killing William White and that this

was done with the intent to prevent William White from communicating information as described in the previous (SECOND) paragraph.

This proposed instruction would have been wrong on the law and would certainly have confused and misled the jury. When all is said and done, we think the instructions as given by Judge Gottschall, when viewed as a whole, were error-free on the elements of the charge against Rand in count 1.

For these reasons, the judgment of the district court is AFFIRMED.

ROVNER, *Circuit Judge*, dissenting. When James Rand agreed to find a body double and victim for Joseph Kalady's incomprehensible scheme, he undoubtedly aided and abetted Kalady in the murder of William White. Such a prosecution would have been an easy one for the state prosecutors. Kalady had told Rand to "get a homeless guy, kill him, and pretend he's me." Rand dutifully brought the homeless man to Kalady, and that man, White, was then killed as planned and placed in a chair, wearing Kalady's ill-fitting clothing, to stand in for Kalady. The prosecutors, however, chose not to take this route. Instead they sought to convict Rand under a witness tampering statute which states:

Whoever kills or attempts to kill another person, with intent to—

* * *

(C) prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings;

shall be punished as provided in paragraph (3).

18 U.S.C. § 1512(a)(1)(C).

The government's theory is that Kalady killed White intending to prevent a pretrial services officer (PSO) from communicating to the court that Kalady had violated his conditions of release by fleeing from home confinement. If true, then Rand aided and abetted Kalady in the commission of that offense. Such a theory would cause any tribunal to raise a brow. Section 1512, after all, is a witness tampering statute clearly designed to protect the integrity of the judicial process by punishing defendants who keep witnesses from testifying.

We need not turn to the purpose of the statute, however, to see why Kalady's (and thus Rand's) crime does not fit. The statute requires that a defendant kill with the intent to **prevent** communication of, in this case, the violation of a condition of release pending a judicial proceeding. Kalady, however, never intended to prevent the PSO from communicating anything; he hoped to manipulate the PSO into communicating information that was not correct—i.e. that Kalady had died, rather than that he had fled. The term "prevent," on its face, implies the use of an act that disables a person from communicating or one that is so coercive as to effectively disable that person from communicating. Feeding false information to a PSO in the hopes that he will communicate the misinfor-

mation rather than the truth is simply in a different league from an act that prevents communication.

If we had any doubt whatsoever about the limitations of the word "prevent" in this context, the remainder of the statute makes it clear. Section 1512(a)(2), for example, criminalizes the use of physical force or the threat of physical force to "hinder, delay *or* prevent" the communication to a judge regarding a violation of a condition of release pending judicial proceedings. 18 U.S.C. § 1512(a)(2) (emphasis supplied). Other sections of the statute similarly refer to attempts to "influence, delay or prevent" communication. 18 U.S.C. §§ 1512 (a)(2)(A), (b)(1). Thus the plain language of the statute sets forth a distinction between actions which may influence, hinder, or delay on the one hand, and actions which wholly prevent communication on the other. Although Kalady intended to influence the information that the PSO communicated, the facts of this case demonstrate precisely why he could not prevent the PSO from communicating that he had fled. The PSO certainly could have accepted Michael Kalady's report that his brother Joe had died, but he was also free to investigate further to determine what message he should send to the court. In fact, Kalady may not have cared that his scheme might eventually unwind and that the message that he fled would then merely have been delayed rather than prevented. By that time, Kalady hoped to be living abroad, perhaps under an assumed identity or in a place safe from detection and extradition.

Of course, the record contains no evidence of Kalady's intent regarding his efforts to thwart communication. For this reason, I particularly am troubled by the majority's naked assertion that "Kalady had the requisite intent required under the statute." *Ante* at 9. Clearly, Kalady's intent was to fake his death, escape an inevitable prison

term, and live undetected in Poland or Massachusetts or wherever his final destination may have been. But an intent to prevent his pre-trial services officer from communicating to the judge that he had violated a condition of his release pending his judicial proceeding? That is not at all clear.

The majority's unsupported assertion of intent is problematic because the statute at issue, 18 U.S.C. § 1512, is a specific intent statute. It requires the government to prove beyond a reasonable doubt that the defendant killed with the specific purpose of preventing communication about a violation of a condition of release. *See U.S. v. Jefferson*, 149 F.3d 444, 446 (6th Cir. 1998) (noting that the government needed to prove that the defendant was motivated by a desire to prevent communication about the defendant's involvement in a federal crime.); *id.* at 447 (Daugherty, J., dissenting) (arguing that a reasonable jury could not determine beyond a reasonable doubt that the defendant had killed the victim to prevent him from communicating with the authorities where there was insufficient evidence of the defendant's specific intent to prevent communication); *U.S. v. Causey*, 185 F.3d 407, 422-23 (4th Cir. 1999) (holding that evidence was insufficient to convict the defendant under § 1512 where evidence revealed that the defendant did not have the requisite specific intent). The majority fails to identify any evidence offered by the government whatsoever to support the hypothesis about Kalady's intent to prevent communication. In fact, the only real information we have about Kalady's intent was that he intended to fake his own death and escape. To travel from Kalady's primary intent—escape—to the statute's requisite intent—prevention of communication—requires quite a few awkward leaps.

It is true, of course, that Kalady intended to fake his own death to manipulate the information that the PSO obtained and, in due course, communicated. Had he merely wished to escape he simply could have flown the coop, without the body double, and hoped no one ever tracked him down. Instead, he wanted to flee without fear of pursuit. For this reason he sought to convince the PSO, and subsequently, the judge, that he had died. Of course, a person who has died cannot violate a condition of release. Ergo, if Kalady convinced the PSO that he had died, the PSO would not have reason to inform the court that he had violated his conditions of release. But hopscotching from Kalady's clear intent—escape—to the inevitable misinformation he created by trying to conceal his escape, steps outside the bounds of the statute.

The fact that Kalady intended that no one find out about his scheme hardly creates the specific intent to prevent communication required by this statute. Most criminals (and not just the particularly clever ones as this case demonstrates) intend to keep their crimes a secret from law enforcement officers and judges. Consequently, as they plan and commit their crimes they tend to take steps to hinder witnesses from communicating information relating to their crime to law enforcement and judges. Almost any action that a defendant takes to divert suspicion from himself or to throw pursuers off his scent—using an alias, wearing a disguise, or pointing the finger at someone else—could be characterized as an effort to "prevent" someone from communicating the truth of criminal culpability. But to transform these steps, which are part and parcel of any crime, into crimes of their own would expand the scope of this witness tampering statute in a manner not contemplated by Congress.

Moreover, the government's attempts to shoehorn Rand's actions into an ill-fitting statute violate the guarantees of due process. Due process requires that a statute must give the ordinary person fair warning of what conduct it prohibits. *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999). As Rand points out, in all other reported appellate cases referring to § 1512(a)(1), the defendant killed or threatened to kill a witness or informant (or his relative) to prevent that person from communicating information. Whereas in this case, preventing a communication was not the true aim of the crime; the purpose of staging Kalady's death was not to prevent a communication, but to alter the message that the authorities received to give Kalady more, or an unlimited, time in which to flee. "[D]ue process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *U.S. v. Lanier*, 520 U.S. 259, 266 (1997). Since the statute is such an ill-fit and no other reported cases support its use in this manner, it is hard to imagine how Rand, or any other ordinary person, could have foreseen that the language of § 1512(a)(1)(c) would apply to his acts.

Rand's action simply do not fit within the plain language of this statute even with a shoehorn. As Cinderella's wicked stepsisters taught us, no good can come of stuffing a foot into an ill-fitting shoe. Particularly where, as here, there were plenty of proverbial shoes just right for Rand's foot.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*